UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAMS SCOTSMAN, INC., <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

**INTRODUCTION**

1.      Defendant Williams Scotsman, Inc., as successor in interest to Mobile Mini, Inc. ("WSI" or the "Company") operates two land transportation and warehousing facilities in Massachusetts, located at 125 Manley Street, West Bridgewater (the "Bridgewater Facility"), and 77 Bridge Road, Salisbury (the "Salisbury Facility") (jointly, the "Facilities"). WSI has been discharging industrial stormwater from the Facilities that contains pollutants picked up at the Facilities. WSI has been discharging this polluted stormwater from the Bridgewater Facility into wetlands that are adjacent to and share a continuous surface water connection with the Hockomock River (the "Hockomock River Wetlands"). WSI has also been discharging this polluted stormwater from the Salisbury Facility into wetlands that are adjacent to and share a continuous surface water connection with Town Creek (the "Town Creek Wetlands").

2.      WSI has never applied for nor received a federal industrial stormwater discharge permit ("Stormwater Permit") for the discharges with respect to either the Bridgewater Facility or the Salisbury Facility, as required by the federal Clean Water Act. 33 U.S.C. §§ 1251-1387

1

(the "Clean Water Act" or "the Act"), and WSI is not properly monitoring and controlling these discharges as required by the Act.

3.      WSI's discharges of stormwater to the Hockomock River Wetlands and the Town Creek Wetlands are in violation of the Clean Water Act. The Commonwealth of Massachusetts brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, reasonable costs including attorney fees, and other relief the Court deems appropriate to redress WSI's illegal stormwater discharges.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

5.      On November 20, 2023, the Commonwealth provided notice of Mobile Mini, Inc.'s violations of the Clean Water Act, and of its intention to file suit against Mobile Mini, Inc. (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Mobile Mini, Inc., pursuant to the Act, 33 U.S.C. § 1365(b)(1)(A). Mobile Mini, Inc. merged with and into WSI on December 16, 2022. WSI on this date assumed the obligations and liabilities of Mobile Mini, Inc., and has continued to operate the Facilities as Mobile Mini, Inc. did prior to the merger.

6.      More than sixty days have passed since notice was served.

7.      This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

2

8. The Commonwealth has an interest in protecting for itself and its residents the integrity of the Massachusetts environment including its waters, and the related health, safety, economic, recreational, aesthetic, and environmental interests those waters provide. Polluted stormwater is the leading cause of water quality impairment in Massachusetts.

9. The Commonwealth has an interest in obtaining timely and accurate information concerning pollutant discharges into the Commonwealth's waters, as is required by the Act.

10. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by WSI's failure to comply with the Clean Water Act as alleged in this Complaint. WSI's violations threaten water quality in the Commonwealth and deprive the Commonwealth of essential information concerning water quality. The requested relief will redress the harms to the Commonwealth caused by WSI's activities. WSI's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

11. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## PARTIES

12. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

13. The Attorney General is the chief law officer of the Commonwealth, with an office at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under M.G.L. c. 12, §§ 3 and 11D.

14. WSI is a foreign corporation that lists its principal address as 901 South Bond Street, Suite 600, Baltimore, Maryland 21231. WSI has two facilities in Massachusetts: the

3

Bridgewater Facility, located at 125 Manley Street, West Bridgewater, Massachusetts 02379, and the Salisbury Facility, located at 77 Bridge Road, Salisbury, Massachusetts 01952.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

15.    The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge follows certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollution Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

16.    During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

17.    To minimize polluted stormwater discharges from industrial facilities, EPA has issued the general industrial Stormwater Permit under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50,804 (Sept. 29, 1995); 65 Fed. Reg. 64,746 (Oct. 30, 2000); 73 Fed. Reg. 56,572 (Sept. 29, 2008); 80 Fed. Reg. 34,403 (June 16, 2015); 86 Fed. Reg. 10,269 (Feb. 19, 2021). Citations herein are to the 2021 Stormwater Permit, which is the same for all relevant purposes as the 2015 version, except that the 2021 revision now requires indicator monitoring for land transportation and warehousing facilities (facilities in Sector P).

18.    Owners and operators of land transportation and warehousing facilities that discharge polluted stormwater to waters of the United States are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-4.

19.     Under the Stormwater Permit, land transportation and warehousing facilities include general storage and warehousing facilities. *Id.*

20.     With respect to each of the Facilities, the Stormwater Permit requires WSI to, among other things:

a)  prepare a stormwater pollution prevention plan ("SWPPP"), Stormwater Permit, Sections 6 (pgs. 55-64); 8.P.4 (pgs. 170-71) (land transportation and warehousing);

b)  submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit, Stormwater Permit, Section 1.3 (pgs. 12-13) and Appendix G;

c)  select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges, Stormwater Permit, Sections 2 (pgs. 17-26); 8.P.3 (pgs. 169-70) (land transportation and warehousing);

d)  collect and analyze stormwater samples and document monitoring procedures for monitoring requirements, Stormwater Permit, Section 4 (pgs. 31-45), including, among other things, quarterly indicator monitoring for: chemical oxygen demand ("COD"), total suspended solids ("TSS"), and pH, Stormwater Permit, Sections 4 and 8.P.6 (pg. 171) (land transportation and warehousing);

e)  conduct and document routine inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facilities' stormwater discharges, ensure that stormwater control measures required by the permit are functioning and are adequate to minimize pollutant discharge, Stormwater Permit, Sections 3 (pgs. 27-31); 8.P.5 (pg. 171) (land transportation and warehousing);

f)  conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater

pollution whenever required by the permit, Stormwater Permit, Section 5 (pgs. 45-55); and

g) timely prepare and submit to EPA all required documents and reports, including but not limited to discharge monitoring reports and annual reports that include findings from the Facilities' inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, Section 7 (pgs. 64-70).

### Citizen Suit Provision of the Clean Water Act

21.    Section 505(a)(1) of the Act authorizes citizen enforcement actions by any "person" against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

22.     The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act, because it is a "person" having an interest which is or may be adversely affected by industrial stormwater pollution discharges. *See* 33 U.S.C. § 1365(g), 1362(5).

23.    Under Section 505 of the Act, this Court has authority to enjoin WSI's violations of the Act's prohibition on unauthorized discharges of pollutants and to require WSI to comply with the Stormwater Permit. The Court also has authority to impose penalties of up to $68,445 per day for each of WSI's prior violations. *See* 33 U.S.C. §§ 1365(a) and 1319(d); 40 C.F.R. § 19.4; 90 Fed. Reg. 1,377 (Jan. 8, 2025).

### STATEMENT OF FACTS

### Description of WSI's Activities

24.    Including the Facilities, WSI has approximately 250 branch locations throughout North America at which it stores and warehouses portable storage containers and

containers used as office units (collectively, "Containers"). The Company has a total fleet of over 200,000 Containers.

25. WSI also transports Containers to and from the Facilities using its own fleet of trucks, drivers, and equipment.

**Description of the Bridgewater Facility and Activities**

26. The Bridgewater Facility consists of approximately six acres on which WSI stores and warehouses Containers, dumpsters, vehicles, and other industrial equipment (collectively, "Industrial Equipment and Materials"). WSI also moves Industrial Equipment and Materials to and from various locations within the Bridgewater Facility.

27. The Bridgewater Facility is directly adjacent to the Hockomock River Wetlands to the east, south, and west. A portion of the Bridgewater Facility is also adjacent to the Hockomock River to the west and southwest.

**WSI's Discharges of Pollutants from the Bridgewater Facility**

28. During every rain or snowmelt event, runoff flows over the Industrial Equipment and Materials and the ground surface at the Bridgewater Facility, picking up pollutants.

29. For at least the last five years, during rain exceeding 0.5 inches, WSI has discharged stormwater from the Bridgewater Facility into the Hockomock River Wetlands. The following figure, taken from MassDEP's Wetland and Wetland Change Areas Map, has been annotated by the Attorney General's Office to depict the location of the Bridgewater Facility in relation to the Hockomock River Wetlands. The figure also depicts the direction of the flow of stormwater from the Bridgewater Facility into the Hockomock River Wetlands.



30.    Approximately 1,000 feet to the south of the Bridgewater Facility, the

Hockomock River flows into an area designated by the Commonwealth as an Area of Critical

Environmental Concern ("ACEC") because it possesses unique and significant natural resources.

At this location, the ACEC contains Priority Habitat for Blanding's Turtle (*Emydoidea*

*blandingii*). Blanding's Turtle is also a candidate for federal listing under the Endangered

Species Act (the "ESA").

### Description of the Salisbury Facility and Activities

31.    The Salisbury Facility consists of approximately five acres on which WSI stores

and warehouses Industrial Equipment and Materials. WSI also moves Industrial Equipment and

Materials to and from various locations within the Salisbury Facility.

32.    The Salisbury Facility is directly adjacent to the Town Creek Wetlands to the

south, east, and northeast. The Salisbury Facility is also adjacent to Town Creek to the north.

**WSI's Discharges of Pollutants from the Salisbury Facility**

33.    During every rain or snowmelt event, runoff flows over the Industrial Equipment and Materials and the ground surface at the Salisbury Facility, picking up pollutants.

34.    For at least the last five years, during rain events exceeding 0.5 inches, WSI has discharged polluted stormwater from the Salisbury Facility into the Town Creek Wetlands. The following figure, taken from MassDEP's Wetland and Wetland Change Areas Map, has been annotated by the Attorney General's Office to depict the location of the Salisbury Facility in relation to the Town Creek Wetlands. The figure also depicts the direction of stormwater flow from the Salisbury Facility into the Town Creek Wetlands.



35.    The portion of the Town Creek Wetlands that is due east of the Salisbury Facility is Core Habitat for the Common Tern (*Sterno hirundo*). According to the Massachusetts Department of Fish & Game, protection of Core Habitat "is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes across

9

Massachusetts."[1] Town Creek flows directly into the Merrimack River, which is Priority and Core Habitat for the Atlantic Sturgeon (*Acipenser oxyrinchus*), the Shortnose Sturgeon (*Acipenser brevirostrum*), and the Bald Eagle (*Haliaeetus leucocephalus*). The Shortnose Sturgeon is also listed as Endangered under the ESA.

**Potential Impacts from Pollutants in WSI's Stormwater Discharges**

36.     Stormwater discharged from land transportation and warehousing facilities, including general storage and warehousing facilities, is likely to contain numerous pollutants. The Stormwater Permit requires such facilities to conduct quarterly indicator monitoring for COD, TSS, and pH to provide a baseline and comparable understanding of polluted stormwater discharge quality, broader water quality problems, and stormwater control measure effectiveness at these facilities.

37.     COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing and potentially asphyxiating aquatic organisms.

38.     TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom-feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive

---

[1] Massachusetts Department of Fish & Game, Division of Fisheries & Wildlife and The Nature Conservancy, BioMap2: Conserving the Biodiversity of Massachusetts in a Changing World (2010).

sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. Sediment poses particular risks to wetlands, which play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects. TSS can harm wetlands by, among other ways, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and downstream water quality and significantly increase the risk of flooding.

39.     The term pH refers to the basicity or acidity of a solution on a scale of 0 to 14, with pH 7 being neutral. Most living organisms, especially aquatic life, function at the optimal pH range of 6.5 to 8.5. Industrial pollutants can change the pH values of nearby waterways. Fluctuating pH or sustained pH outside the optimal range physiologically stresses many species and can result in decreased reproduction, decreased growth, disease, or death. This can ultimately lead to reduced biological diversity in streams or wetlands. Even small changes in pH can shift community composition in water bodies. This is because pH alters the chemical state of many pollutants (e.g., copper, ammonia), changing their solubility, transport, and bioavailability. This can increase exposure to and toxicity of metals and nutrients to aquatic plants and animals. pH is one of the most important environmental factors limiting species distributions in aquatic habitats.

**WSI's Failure to Comply with the Requirements of the Stormwater Permit**

40.     Based on the storage and warehousing activities that WSI conducts at the Facilities as set forth above, the Facilities are transportation and warehousing facilities that are subject to the requirements of the Stormwater Permit.

41.     WSI has not applied for or obtained a Stormwater Permit for its operations at either of the Facilities.

42.     WSI has not complied with the terms of the Stormwater Permit. In particular, with respect to each of the Facilities, WSI has failed to:

    a.   prepare a SWPPP (violation of Sections 6 and 8.P.4 of the Stormwater Permit);

    b.   submit an NOI (violation of Section 1.3.2 of the Stormwater Permit);

    c.   select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (violation of Sections 2 and 8.P.3 of the Stormwater Permit);

    d.   collect and analyze stormwater samples and document monitoring procedures for monitoring requirements, including quarterly indicator monitoring for COD, TSS, and pH (violation of Sections 4 and 8.P.6 of the Stormwater Permit);

    e.   conduct and document routine inspections and quarterly visual assessments to, among other things, sample and assess the quality of each Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharges, and ensure timely corrective actions are taken when they are not (violation of Sections 3 and 8.P.5 of the Stormwater Permit);

f.  conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (violation of Section 5 of the Stormwater Permit); and

g.  timely prepare and submit to EPA all documents and reports, including but not limited to discharge monitoring reports and annual reports that include findings from inspections of the Facilities and visual assessments and the documentation of corrective actions (violation of Section 7 of the Stormwater Permit).

## FIRST CAUSE OF ACTION

**Discharges of Polluted Stormwater from the Bridgewater Facility Without a Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

43.  The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

44.  WSI is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

45.  The Hockomock River Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

46.  By discharging polluted stormwater from the Bridgewater Facility without a Stormwater Permit into the Hockomock River Wetlands, WSI has violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

47.  Each day during the last five years that WSI discharged polluted stormwater from the Bridgewater Facility into the Hockomock River without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which

13

the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§1365(a)(1) and (f).

48.     These violations establish an ongoing pattern of failure to comply with the Act's requirements.

## SECOND CAUSE OF ACTION

**Discharges of Polluted Stormwater from the Salisbury Facility Without a Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

49.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

50.     WSI is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

51.     The Town Creek Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

52.     By discharging polluted stormwater from the Salisbury Facility without a Stormwater Permit into the Town Creek Wetlands, WSI has violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

53.     Each day during the last five years that WSI discharged polluted stormwater from the Salisbury Facility into the Town Creek Wetlands without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§1365(a)(1) and (f).

54.     These violations establish an ongoing pattern of failure to comply with the Act's requirements.

14

### THIRD CAUSE OF ACTION

**Noncompliance with the Federal Stormwater Permit for the Bridgewater Facility:
Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

55.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

56.     WSI has violated and continues to violate the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 42, above.

57.     WSI's violations of each of the requirements set forth in paragraph 42, above, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

58.     These violations establish an ongoing pattern of violations with the Stormwater Permit's requirements.

### FOURTH CAUSE OF ACTION

**Noncompliance with the Federal Stormwater Permit for the Salisbury Facility:
Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

59.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

60.     WSI has violated and continues to violate the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 42, above.

61.     WSI's violations of each of the requirements set forth in paragraph 42, above, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

62.    These violations establish an ongoing pattern of violations with the Stormwater Permit's requirements.

**RELIEF REQUESTED**

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1.    Require WSI to obtain and comply with EPA's federal Stormwater Permit at both of the Facilities and to cease operations at both of the Facilities until it has obtained and complied with the Stormwater Permit;

2.    Order WSI to pay civil penalties of up to $68,445 per day for each of its prior violations. *See* 33 U.S.C. §§ 1311(a); 1365(a); 1319(d); 40 C.F.R. § 19.4; 90 Fed. Reg. 1,377 (Jan. 8, 2025);

3.    Order WSI to take appropriate actions to restore the quality of wetlands and waterways subjected to impairment from their unlawful activities;

4.    Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.    Award any other and further relief as this Court may deem appropriate.

Dated: January 13, 2025

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL


_____

Helen Yurchenco (Bar No. 712235)
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 963-2507
helen.yurchenco@mass.gov

17